IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Case No. 02-23106-CIV-MOORE

INTERNATIONAL FIDELITY )
INSURANCE COMPANY )
)
)
Plaintiff, )
)
v. )
)
CRISAL CONSTRUCTION CO., )
INC., a Florida corporation, )
OVIDIO P. RODRIGUEZ, )
ALICIA MARTI RODRIGUEZ, )
WILLIAM D. REAL, and )
CRISTINA M. REAL )
)
Defendants. )
)



## PLAINTIFF INTERNATIONAL FIDELITY INSURANCE COMPANY'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY JUNCTION AGAINST DEFENDANTS CRISAL CONSTRUCTION CO., INC., OVIDIO P. RODRIGUEZ, AND ALICIA MARTI RODRIGUEZ

**COMES NOW** Plaintiff International Fidelity Insurance Company ("IFIC"), by and through

its undersigned counsel, pursuant to Rule 65 of the Federal Rules of Civil Procedure and S.D. Fla.

L. R. 7.1, and hereby moves this Honorable Court for a Temporary Restraining Order and

Preliminary Injunction against Defendants Crisal Construction Co., Inc., Ovidio P. Rodriguez, and

Alicia Marti Rodriguez (collectively, the "TRO Defendants"). In support of this Motion, IFIC states

as follows:

1.      Defendants Crisal Construction Co., Inc. ("Crisal"), Ovidio P. Rodriguez, Alicia

Marti Rodriguez, William D. Real and Cristina M. Real are each liable to IFIC under an Agreement



of Indemnity.  The referenced Agreement of Indemnity was executed by the Defendants in exchange

for IFIC's issuance of construction surety bonds to Defendant Crisal.  By the terms of the Agreement

of Indemnity, IFIC is entitled to be exonerated and indemnified for all losses, costs, and attorney's

fees incurred both as a result of having issued bonds on behalf of Defendant Crisal, and as a result

of enforcing the covenants and conditions of the Agreement of Indemnity.  To date, IFIC has already

sustained losses under the bonds issued on behalf of Defendant Crisal, and IFIC expects to incur

considerable, additional losses in the future.

      2.     There is a substantial likelihood of irreparable harm to IFIC in this case if a temporary

restraining order is not granted against Defendants Crisal, Ovidio P. Rodriguez and Alicia Marti

Rodriguez. Defendant Crisal has ceased its operations.  In June of 2001, IFIC issued bonds on behalf

of Defendant Crisal which guaranteed its performance of its contractual obligations to the School

Board of Miami Dade County, Florida for the renovation and additions to the Phillis Wheatley

Elementary School. The School Board of Miami Dade County, Florida ("MDPS") recently

terminated Crisal from its contract for the Project as a result of its failure to fulfil its contractual

obligations.   MDPS immediately called upon IFIC to fulfil its obligations under the Bonds to

complete the Phillis Wheatley Project. At or near the time Crisal was terminated from the Project,

Defendant Ovidio P. Rodriguez sold a large portion of his assets.  At the time of the sale, the TRO

Defendants were aware of that liability had been asserted against IFIC and that they would be liable

to IFIC under the terms of the Agreement of Indemnity.  Moreover, and more critically, IFIC has

reason to believe that Defendant Crisal is dissipating or about to dissipate its remaining assets in the

form of equipment and materials.  Demand has been made upon all of the Defendants to place IFIC

in funds as required by the Agreement of Indemnity.  However, the Defendants have ignored IFIC's

demand.  IFIC justifiably fears that any actions to further dissipate the assets of Defendants Crisal, Ovidio P. Rodriguez and Alicia Marti Rodriguez upon which IFIC relied in issuing bonds on behalf of Defendant Crisal, will leave insufficient assets to satisfy IFIC's legal and equitable rights against the Defendants.  As illustrated in the Memorandum of Points and Authorities attached to this Motion, these circumstances warrant the granting of injunctive relief so as to restrain Defendants Crisal, Ovidio P. Rodriguez and Alicia Marti Rodriguez from selling, transferring, further encumbering, or otherwise disposing their assets during the pendency of this case.

3.      In addition to MDPS's performance bond claim, IFIC has received claims under the payment bond issued by IFIC issued on behalf of Defendant Crisal in Crisal's role as Contractor and bond principal on the Phillis Wheatley Project.  IFIC expects to receive numerous additional claims in the future.  IFIC faces uncertain and potential substantial losses as a result of these claims.

4.      As a result of Defendant Crisal's termination from the Phillis Wheatley Project , IFIC has suffered, and will continue to suffer, a loss of goodwill with MDPS, subcontractors, and suppliers on the Project.  Further, because Defendant Crisal has ceased its operations, IFIC may be deprived of any chance of recovering monetary damages for its potential losses.  Injunctive relief restraining Defendants Crisal, Ovidio P. Rodriguez, and Alicia Marti Rodriguez from certain activity, including selling, transferring, further encumbering, or otherwise disposing of their assets, is necessary to ensure that future claims of subcontractors and suppliers of Defendant Crisal will be paid with funds supplied by said Defendants as contemplated under the Agreement of Indemnity, and to ensure that IFIC will be reimbursed, at least in some part, for the substantial losses it will incur as a result of being called upon by MDPS to complete the Wheatley Project..

5.      Through this Motion, IFIC seeks a Temporary Restraining Order, and ultimately a

3

Preliminary Injunction, restraining Defendants Crisal, Ovidio P. Rodriguez, and Alicia Marti Rodriguez from selling, transferring, further encumbering, or otherwise disposing of their assets and property until the disposition of this case.

6.  Additionally, IFIC requests expedited discovery in the form of depositions of the TRO Defendants.

7.  The undersigned certifies that he has given notice to the TRO Defendants of this Motion by way of facsimile to Crisal Construction Co., Inc. at (305) 667-2386 and to Ovidio P. Rodriguez at (305) 461-8642 and overnight delivery to Ovidio P. and Alicia Marti Rodriguez at 7101 SW 69th Avenue, Miami, Fl 33143, Crisal Construction Co., Inc. at 4661 SW 71st Avenue, Miami, FL 33155, William J. and Cristina M. Real at 7120 SW 71 Ct., Miami, FL 33143-3046. IFIC justifiable fears that providing notice of this Motion and the relief sought herein will cause the further dissipation of assets by the TRO Defendants.

**WHEREFORE**, Plaintiff International Fidelity Insurance Company requests that this Honorable Court enter a Temporary Restraining Order, and eventually a Preliminary Injunction, restraining any transfer or further encumbrance of the assets of Defendants Crisal, Ovidio P.

Rodriguez, and Alicia Marti Rodriguez until the resolution of this case, and that it grant such further relief as it deems just and proper under the circumstances.

Respectfully submitted,

_____
Neil L. Henrichsen, Esq.
Florida Bar No.: 0111503
Helen H. Albee, Esq.
Florida Bar No.: 0987247
Henrichsen Siegel Moore, P.L.L.C.
200 E. Forsyth Street
Jacksonville, Florida 32202
(904) 355-2233
(904) 596-5705 (Facsimile)
Nhenrichsen@hslawyers.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion for Temporary Restraining Order and Preliminary Injunction, all attachments thereto and the proposed Order Granting Temporary Restraining Order was furnished to Ovidio P. and Alicia Marti Rodriguez, 7101 SW 69th Avenue, Miami, Fl 33143, Crisal Construction Co., Inc., 4661 SW 71st Avenue, Miami, FL 33155, William J. and Cristina M. Real, 7120 SW 71 Ct., Miami, FL 33143-3046 by overnight delivery and to Crisal Construction Co., Inc. by facsimile at (305) 667-2386 and Ovidio P. Rodriguez at (305) 461-8642, this 31st day of October, 2002.

Neil L. Henrichsen

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Case No. 02-23106-CIV-MOORE

|  |  |
|---|---|
| INTERNATIONAL FIDELITY<br>INSURANCE COMPANY<br><br>    Plaintiff,<br><br>v.<br><br>CRISAL CONSTRUCTION CO.,<br>INC., a Florida corporation,<br>OVIDIO P. RODRIGUEZ,<br>ALICIA MARTI RODRIGUEZ,<br>WILLIAM D. REAL, and<br>CRISTINA M. REAL<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF INTERNATIONAL FIDELITY INSURANCE COMPANY'S
MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY
INJUNCTION AGAINST DEFENDANTS
CRISAL CONSTRUCTION CO., INC., OVIDIO P. RODRIGUEZ,
AND ALICIA MARTI RODRIGUEZ**

**COMES NOW** the Plaintiff, International Fidelity Insurance Company ("IFIC"), by and

through its undersigned counsel, and hereby submits the following Memorandum of Points and

Authorities in support of its Motion for Temporary Restraining Order against Defendants Crisal

Construction Co., Inc. ("Crisal"), Ovidio P. Rodriguez, and Alicia Marti Rodriguez (collectively, the

"TRO Defendants").

**I.     INTRODUCTION**

This case arises from the execution of an Agreement of Indemnity by Defendants Crisal,

Ovidio P. Rodriguez, Alicia Marti Rodriguez, William D. Real and Cristina M. Real in consideration

of, and inducement for, the issuance of construction surety bonds by IFIC on behalf of Defendant Crisal.  Under the terms of that Agreement of Indemnity, IFIC is entitled to be indemnified for all losses, costs, and attorney's fees incurred as a result of having issued bonds on behalf of Defendant Crisal, and incurred in enforcing the covenants and conditions of the Agreement of Indemnity.

IFIC issued surety bonds to Crisal, including a bond with a penal sum in excess of $2 Million for a school renovation for the School Board of Miami-Dade County, Florida.  Crisal's right to complete this construction contract was terminated by the School Board of Miami-Dade County, Florida.  Due to Crisal's termination from the school project, IFIC has begun to sustain losses under the bonds issued on behalf of Defendant Crisal, and IFIC expects to incur substantial, additional losses in the future.

IFIC has recently learned that Defendant Ovidio P. Rodiguez has begun dissipating the assets of the TRO Defendants.  The dissipation of assets occurred during the same time period that Crisal was terminated from the Wheatley Project and IFIC was called upon to complete the Wheatley Project. The TRO Defendants have knowledge of their potential liability to IFIC, as surety to Crisal, as they are sophisticated in the field of general contracting, especially in the area of public works projects. Due to the TRO Defendants' manipulation of assets, IFIC may be unable to ever obtain monetary damages for what may ultimately be very significant losses.

Given these circumstances, which are more fully set forth below, the injunctive relief requested by IFIC is proper and warranted under both contract and common law principles.  Without the benefit of an order granting such relief, IFIC will suffer irreparable harm to its interests.  In requesting an order restraining the sale, transfer, encumbrance, or other dissipation of the assets of the TRO Defendants, IFIC endeavors only to preserve the status quo, to compel the TRO Defendants

2

to meet pre-existing and well recognized obligations, and to seek what IFIC is already entitled to under law in its role as surety to Defendant Crisal.

## II.     STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

### A.     <u>The Bonds and the Underlying Contracts</u>

On or about June 26, 2000, IFIC, as surety, issued certain payment and performance bonds (the "Bonds") on behalf of Defendant Crisal, as principal, for the School Board of Miami Dade County, Florida's ("MDPS") Project No. A-0654, commonly known as the Phillis Wheatley Elementary School, Renovations and Additions (the "Wheatley Project"). <u>See</u> the Affidavit of Frank Whelan (the "Whelan Aff.") ¶ 4, which is attached hereto as Exhibit A. The penal sum of the Bonds is $2,197,000.00. Pursuant to their terms, the Bonds guaranteed Defendant Crisal's performance of its contractual obligations on the Wheatley Project, as well as its payment to those providing Crisal with labor and/or materials for the Wheatley Project. <u>See</u> Whelan Aff. ¶ 5.

### B.     <u>The Agreement of Indemnity and the Defendants' Breach Thereof</u>

As inducement for and in consideration of IFIC's issuance of the Bonds, Defendant Crisal, as "Contractor," and Defendants Ovidio P. Rodriguez, Alicia Marti Rodriguez, William D. Real and Cristina M. Real, as "Indemnitors," executed an Agreement of Indemnity. <u>See</u> Whelan Aff. ¶ 6. A copy of the Agreement of Indemnity is attached to Whelan Aff. as Exhibit 1. Pursuant to the Agreement of Indemnity, each of the named Defendants agreed, among other things, to the following indemnity provision:

### INDEMNITY

> The Contractor [Crisal] and Indemnitors shall exonerate, indemnify, and keep indemnified the Surety [IFIC] from and against any and all liability for losses and/or expenses of whatsoever kind or nature (including, but not limited to,

3

interest, court costs and counsel fees) and from and against any and all such losses and/or expenses which the Surety may sustain and incur: (1) By reason of having executed or procured the execution of the Bonds, (2) By reason of the failure of the Contractor or Indemnitors to perform or comply with the covenants and conditions of this Agreement or (3) In enforcing any of the covenants and conditions of this Agreement. Payment by reason of the aforesaid causes shall be made to the Surety by the Contractor and Indemnitors as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor. Such payment shall be equal to the amount of the reserve set by Surety. In the event of any payment by the Surety the Contractor and Indemnitors further agree that in any accounting between the Surety and the Contractor, or between the Surety and the Indemnitors, or either or both of them, the Surety shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters herein contemplated by this Agreement under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of the liability to the Surety.

See Whelan Aff. ¶ 7. Thus, under the Agreement of Indemnity, IFIC is entitled to be indemnified for all losses, costs, and attorney's fees incurred as a result of having issued the Bonds on behalf of Defendant Crisal and incurred in enforcing the covenants and conditions of the Agreement of Indemnity. Additionally, IFIC is entitled to payment in the amount of the reserve set as soon as liability is asserted against it, whether IFIC has actually made any payments or not.

Alicia Marti Rodriguez is the President of Crisal. At the time the Bonds were issued by IFIC on behalf of Crisal, William Real was the Vice President of Crisal. Ovidio P. Rodriguez was the primary investor in Crisal. The Rodriguez defendants had substantial financial interests in Crisal. As a result of their large financial stake in Crisal, Defendants Ovidio and Alicia Rodriguez, among others, had a substantial, material and beneficial interest in obtaining bonding from IFIC and IFIC relied on their representations of their financial position in entering into the bonding relationship

with Crisal and in executing the Agreement of Indemnity. See Whelan Aff. ¶ 8.

IFIC has already received claims under the Bonds that IFIC issued on behalf of Defendant Crisal in Crisal's role as Contractor and bond principal on the Project. See Whelan Aff. ¶ 9. The most significant of these bond claims is MDPS's demand for IFIC to remedy Crisal's default or take over completion of the $2,197,000 Wheatley Project. See id. Further, IFIC expects to receive numerous, additional claims in the future. See id. In spite of IFIC's requests to Defendant Crisal for information about these bond claims, in particular, the termination by MDPS, Crisal has failed to provide any substantive information regarding this claim. See Whelan Aff. ¶ 10. Presently, IFIC is working with MDPS to complete the Wheatley Project. See id.

Pursuant to the aforementioned bond claims, IFIC has already sustained losses under the bonds issued on behalf of Defendant Crisal. See Whelan Aff. ¶ 20. Moreover, IFIC justifiably fears it may incur substantial, additional losses in the future. See Whelan Aff. ¶ 21. Nevertheless, despite requests from IFIC, each of the Defendants have failed to indemnify and collateralize IFIC for its expected future losses. See Whelan Aff. ¶¶ 16-19.

On October 21, 2002, IFIC filed a Complaint for Specific Performance, Exoneration and Quia Timet Relief, and Indemnification against the five Defendants. IFIC's Complaint seeks indemnification and equitable relief against each of the named Defendants relating to the losses and expenses incurred, or expected to be incurred, as a result of IFIC's issuance of construction surety bonds on behalf of Defendant Crisal, and as a result of IFIC's efforts to enforce the covenants and conditions of the Agreement of Indemnity.

### D.   IFIC's Investigation of its Exposure

In response to the termination of Crisal by MDPS on the Wheatley Project and MDPS's

demand that IFIC perform its obligations under the Bonds, IFIC hired the construction consulting firm of Lovett, Silverman and Associates ("Lovett, Silverman") to analyze the status of the Project, the business operations of Defendant Crisal as it relates to the Project, and financial position of Crisal as it relates to the Project. See Whelan Aff. ¶ 11. In the course of its investigation, Lovett, Silverman has undertaken, among other things, the following: (1) interviewing key personnel at Defendant Crisal's home office; (2) reviewing the financial and other documentation surrounding the Project; (3) visiting the job site of the Project; and (4) meeting with key construction personnel at the job site of the Project. See Whelan Aff. ¶ 12. Based upon the investigation and analysis of Lovett, Silverman, IFIC has set reserves for the bonded projects in the amount of $200,000.00. See Whelan Aff. ¶ 14. The reserve amount reflects Defendant Crisal's outstanding accounts payable on the Project, plus the cost to complete the Project, less any remaining funds in Crisal's contracts on the Project. See id.[1]

IFIC has recently learned that Defendant Ovidio P. Rodriguez sold a large piece of commercial property for $1.2 Million on or about August 30, 2002. See Whelan Aff. ¶ 15. This sale occurred just after Crisal had been terminated from the Wheatley Project and IFIC was called upon by MDPS to complete the Wheatley Project. Defendant Ovidio P. Rodriguez was aware of the termination of Crisal from the Wheatley Project as a result of a meeting he had with IFIC on August 20, 2002. See id. Furthermore, Defendant Crisal no longer employs any personnel, it is not working on any projects at all, and it is not seeking any new projects. In sum, at this time, IFIC justifiably fears that if the TRO Defendants continue to dissipate their assets, upon which IFIC relied in issuing

---

[1]  Moreover, and as previously mentioned, IFIC has received and may continue to receive claims under the payment bonds issued on behalf of Defendant Crisal.

bonds on behalf of Defendant Crisal, there will not be sufficient assets to satisfy IFIC's legal and equitable rights against the Defendants.  <u>See</u> Whelan Aff. ¶ 21.

## III.   LEGAL ARGUMENT

### A.   <u>The Circumstances of This Case Warrant the Imposition of a Temporary Restraining Order.</u>

It is well established that determinations as to preliminary injunctive relief are in the sound discretion of the trial court. <u>See, e.g.</u>, <u>Haitian Refugee Center, Inc. v. Nelson</u>, 872 F.2d 1555, 1561 (11th Cir. 1989), <u>aff'd sub nom.</u>, 498 U.S. 479 (1991); <u>U.S. v. Lambert</u>, 695 F.2d 536, 539 (11th Cir. 1983); <u>Mercury Motor Express, Inc. v. Brinke</u>, 475 F.2d 1086, 1095 (5th Cir. 1973).[2] This discretion is guided by four requirements that must be met before preliminary injunctive relief is granted. <u>Haitian Refugee Center</u>, 872 F.2d at 1561; <u>Lambert</u>, 695 F.2d at 539.  The four elements to be considered are (1) a substantial likelihood of success on the merits; (2) irreparable injury to the movant if injunctive relief is not granted; (3) the threatened injury to the movant outweighs the potential harm to the opposing party; and (4) the injunctive relief, if granted, would not be adverse to the public interest.  <u>Haitian Refugee Center</u>, 872 F.2d at 1561-62.

Based upon well established concepts of contract law and equity, IFIC will in all likelihood succeed on the merits in this case.  Further, the failure of Crisal and the indemnitors to fulfill their contractual obligations to IFIC, IFIC's exposure to uncertain losses as a result of Crisal's termination from the Wheatley Project, and Defendant Ovidio P. Rodriguez's actions to dissipate valuable assets, evidence that IFIC will suffer irreparable harm if the requested injunctive relief is not granted.   A balancing of the relative harms at issue between IFIC and the TRO Defendants favors the granting

---

[2] Cases from the former Fifth Judicial Circuit are binding precedent in the Eleventh Judicial Circuit. <u>E.g.</u>, <u>Bonner v. City of Prichard</u>, 661 F.2d 655 (5th Cir. 1981) (en banc).

of a temporary restraining order.  Finally, public policy supports the injunctive relief that is requested.

### 1.   IFIC will likely succeed on the merits in this case.

IFIC has filed a Complaint alleging counts for specific performance, exoneration and <u>quia timet</u> relief, and indemnification.  The remedies sought by IFIC in the Complaint are readily granted by courts to sureties in circumstances where a bond principal has defaulted on its contractual and bond obligations.

### a.   Count I for Specific Performance

With regard to Count I of IFIC's Complaint, it is well established that sureties are entitled to specific performance of collateral security clauses in indemnification agreements.  <u>See</u> <u>Transamerica Premium Ins. Co. v. Cavalry Construction, Inc.</u>, 552 So.2d 225, 226  (Fla. 5th DCA 1989); <u>Safeco Insurance Company of America v. Schwab</u>, 739 F.2d 431, 433 (9th Cir. 1984); <u>Milwaukee Constr. Co. v. Glen Falls Ins. Co.</u>, 367 F.2d 964, 966-67 (9th Cir. 1966); <u>United Bonding Insurance Company v. Stein</u>, 273 F. Supp. 929, 930 (E.D. Pa. 1967).  The United States District Court for the District of Maryland has noted that "[i]t is well settled that a surety may sue for specific performance for deposit of security to cover the surety's reserve if such a provision is found in the indemnity agreement."  <u>Employers Insurance of Wausau v. Bond</u>, 1991 U.S. Dist. LEXIS 951, *11 (D. Md. January 25, 1991) (a copy of this unpublished opinion is attached as Exhibit B).  In <u>United Bonding</u>, the court detailed the elementary steps necessary for an award of specific performance:  "the only conditions precedent to Defendants' obligation were the Plaintiff's estimate that a reserve was necessary and its demand upon Defendants for current funds in the amount of such reserve." <u>United Bonding</u>, 273 F. Supp. at 930.

The collateral deposit provision of the Agreement of Indemnity is a separate right contracted for by the surety other than its right to be indemnified for payment of claims under the bond. See McClure v. Deerland Corp., 585 A.2d 19, 23 (Pa. Super. 1991). The Pennsylvania Superior Court in McClure held that specific performance was the remedy for "the then-existing rights to require reserve for claims to be immediately posted and held as collateral," separate and apart from the surety's right to indemnification. Id.; see also American Motorists Ins. v. United Furnace Co., 876 F.2d 293, 301 (2nd Cir. 1989) ("If the parties had intended to give security deposited upon the maturity or liquidation of claims, they would have conditioned the defendants' obligation upon such maturity or liquidation, instead of providing, as they did, for the giving of security whenever the Plaintiff, in anticipation of possible losses, might set up a reserve to cover them").

Importantly, courts will grant specific performance without first making a determination whether or not the underlying claims giving rise to the posted reserve are valid. Thus, an inquiry into the claims themselves is irrelevant. For instance, in Standard Surety & Casualty Co. of New York v. Caravel Indus. Corp., 15 A.2d 258 (N.J. Ch. 1940), the New Jersey Court of Chancery refused to determine whether the government's claim on a performance bond was valid. Id. at 260. In interpreting the duties of the defendant indemnitors, the court concluded that: "[d]efendants did not agree to post collateral only if a valid claim were made, but if any claim were made and complainant found it necessary in consequence thereof to set up a reserve." Id. As a result, the court in Standard Surety looked to the parties' intent at the time of the execution of the Agreement of Indemnity:

> What the parties had in mind when defendants agreed to deposit collateral was that at some distant day the liability of complainant might be established by judgment and principal debtor, as well as, defendants, be at that time insolvent. To guard against that contingency, the defendants agree to make a deposit as soon as a serious question of liability should arise. Such a situation has now arisen.

9

Id. at 260-61.

Such a situation has arisen in the instant case. Defendant Crisal has ceased operations and liability has been asserted against IFIC in the form of payment bond claims and MDPS's demand for performance under the Performance and Guarantee Bond issued for the Wheatley Project. The Bonds have a penal sum in excess of $2 Million. The TRO Defendants, among others, agreed to pay IFIC "as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor. Such payment shall be equal to the amount of the reserve set by the Surety." See Whelan Aff, Exh. 1. IFIC has set a reserve equal to its current estimate of potential losses and has demanded that the TRO Defendants, among others, exonerate and indemnify it in the amount of the reserve. See Whelan Aff. ¶ 14, 16, 17. The TRO Defendants have blatantly ignored their contractual obligations and have refused to respond to IFIC's request for compliance with Agreement of Indemnity. See Whelan Aff. ¶ 18, 19. Based on the case law cited above and the plain language of the Agreement of Indemnity, it is quite clear that IFIC will succeed in specifically enforcing its rights pursuant to the Agreement of Indemnity under Count I of its Complaint.

**b.    Count II for Exoneration and Quia Timet Relief**

"Historically, a bill quia timet was the procedural device by which a court of equity would exercise its jurisdiction 'to protect a party against the occurrence of some future injury which he fears he may suffer, but which cannot be avoided by a present action at law' . . ." Borey v. National Union Fire Insurance Company of Pittsburgh, 934 F.2d 30, 32 (2nd Cir. 1991) (citing Mann & Jennings, Quia Timet: A Remedy for the Fearful Surety, 20 Forum 685, 686 (1985)). Similarly, exoneration is "the surety's right, after the principal's debt has matured, to compel the principal to honor its obligation to the creditor." Borey, 934 F.2d at 32. "Petitions for relief based on quia timet are writs

10

of prevention to accomplish the ends of precautionary justice." 30 C.J.S. Equity § 406 (1965). As noted by the United States District Court for the Second Circuit, "the existence of the principal's duty to pay gives a surety the equitable right to call upon the principal to exonerate him from liability by discharging the debt when it becomes due." Borey, 934 F.2d at 33. The United States Court of Appeals for the Fifth Circuit has held that where a principal is insolvent or has absconded, "the equity of exoneration needs and may have further protection. Injunctions, receivers, and equitable garnishments have been granted, property recovered from third parties, and funds traced and applied." Glades County, Florida v. Detroit Fidelity & Surety Co., et al., 57 F.2d 449, 452 (5th Cir. 1932).

Crisal owes debts to those who provided labor and or materials on the Wheatley Project and have not been paid. Those claimants are now looking to IFIC for payment under the Bonds. Additionally, Crisal owed a duty to MDPS to fulfill its contractual obligations. However, as a result of Crisal's default and termination, MDPS is looking to IFIC for performance and completion of the Contract under the Performance Bond. Through its claims for quia timet and exoneration, IFIC simply seeks to compel Crisal and the other indemnitors to honor their obligations to these claimants. Based on the case law cited above and the facts of this case, it is also clear that IFIC will succeed in enforcing its equitable rights to exoneration and quia timet relief under Count II of its Complaint.

### c.     Count III for Indemnification

As a general principle, sureties posses a right to indemnification from the principal for monies spent in fulfilling that principal's obligations on the underlying contract. E.g., Shannon R. Ginn Const. Co. v. Reliance Insurance Co., 51 F. Supp. 1347, 1350 (S.D. Fla. 1999). Because the usual mechanism for this right is an agreement of indemnity, it is well recognized that "[a] surety

is entitled to reimbursement pursuant to an indemnity contract for any payments made by it in a good faith belief that it was required to pay, regardless of whether any liability actually existed." Employers Insurance of Wausau v. Able Green, Inc., 749 F. Supp. 1100, 1103 (S.D. Fla. 1990); see also Fidelity & Deposit Co. of Maryland v. Bristol Steel, 722 F.2d 1160, 1163 (4th Cir. 1983) ("Under the 'letter' of this contract, the Sureties had the right to reimbursement by the Contractor for any payment made by them in good faith under the belief that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed"); Thurston v. International Fidelity Insurance Co., 528 So.2d 128, 129 (Fla. 3rd Dist. Ct. App. 1988) ("A surety is entitled to reimbursement pursuant to an indemnity contract for any payments made by it in a good faith belief that it was required to pay, regardless of whether any liability actually existed"); Waterhouse v. McDevitt & Street Co., 387 So.2d 470 (Fla. 5th Dist. Ct. App. 1980) (same).

IFIC has already received claims under the bonds issued on behalf of Defendant Crisal, and IFIC expects to incur substantial, additional losses in the future as a result of Defendant Crisal's failure to fulfill its obligations under the Contract. See Whelan Aff. ¶ 15. IFIC's rights to indemnification are clearly articulated in the Agreement of Indemnity, and IFIC will likely prevail on the merits of its indemnity claim based upon both the case law cited above and general principles of contract law.

### 2. IFIC will suffer irreparable harm if its request for equitable relief is not granted, and notice as to IFIC's request for equitable relief is not practical at this juncture.

The record in this case demonstrates that IFIC will suffer irreparable harm unless the Court intervenes and grants the requested injunctive relief. This court may enjoin the dissipation of a corporation's assets in order to maintain the status quo and preserve future equitable remedies. Fed.

R.Civ. P. 65; see Federal Savings and Loan Insurance Corp v. Dixon, 835 F.2d 554, 660-61 (11th Cir. 1987); Meis v. Sanitas Service Corp., 511 F.2d 655, 656-7 (5th Cir. 1975). Irreparable harm may also be established upon the likelihood of a loss of goodwill to a plaintiff's business, Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 552 (4th Cir. 1994); Blackwelder Furniture Co. of Statesville v. Selig Manufacturing Co., Inc., 550 F.2d 189, (4th Cir. 1977), or where "damages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected." Hughes Network Systems, Inc. v. Interdigital Communications Corporation, 17 F.3d 691, 693 (4th Cir. 1994). All of these factors are present in the instant case.

IFIC expects to incur substantial losses in the future as a result of issuing the Bonds on behalf of Defendant Crisal. See Whelan Aff. ¶ 9. Indeed, IFIC has set a reserve of $200,000.00 for the Bonds. See Whelan Aff. ¶ 14. On August 30, 2002, Defendant Ovidio P. Rodriguez sold a piece of commercial property for $1.2 Million. This sale occurred 10 days after Crisal was placed on notice that it was being terminated from the Wheatley Project and soon after Ovidio Rodriguez's meeting with IFIC regarding this situation. IFIC had contractual and equitable interests in this property, of which the TRO Defendants were aware, to defray its losses under the Bonds. Moreover, Defendant Crisal's nonperformance and nonpayment on the Wheatley Project has impacted IFIC's goodwill with other actors on this Project which can be detrimental to IFIC's ability to complete the Wheatley Project expeditiously and cost effectively. Finally, Defendant Crisal has ceased operating, leaving only the individual indemnitors from whom IFIC can recoup its losses and expenses incurred as a result of the issuance of the Bonds on behalf of Crisal. See Whelan Aff. ¶ 13. The TRO Defendants are dissipating assets and refusing to exonerate IFIC. As a result, there is the very real possibility

13

that before IFIC can establish its rights to the assets in question through a trial on the merits, the nonexempt assets of the TRO Defendants may be placed beyond the reach of creditors, including IFIC. All of these circumstances present just the sort of irreparable harm that pretrial injunctive relief is designed to preempt, and the likelihood of accelerating the deleterious effects of these circumstances by notifying the TRO Defendants of IFIC's request for injunctive relief makes such notice impractical at this early point in the proceedings. See Whelan Aff. ¶¶ 22, 23.

### 3.   The TRO Defendants will suffer little, if any, harm, because the relief requested simply enforces their preexisting obligations.

When weighing the relative harms at issue in this case, it is clear that IFIC only seeks to enforce the TRO Defendants' preexisting obligations under the Agreement of Indemnity, and under rights readily enforced in equity. The TRO Defendants were obligated not only to reimburse IFIC for amounts expended under the Bonds, but also to place IFIC in funds for projected losses. Thus, restraining the assets of the TRO Defendants creates no more of an obligation on them than they already had under the Agreement of Indemnity.[3]

Further, as previously discussed, Crisal has ceased operating. Indeed, upon information and belief, the Wheatley Project was the only large contract remaining to be completed. Restraining the assets of a company which is not in the process of prosecuting new work will cause little harm, particularly in light of the irreparable injury that will be suffered by IFIC if a temporary restraining order is not granted.

### 4.   Granting the requested injunctive relief is in the public interest.

_____

[3] It should also be noted that Defendant Ovidio P. Rodriguez has income from his employment with Miami Dade County, Florida. This fact greatly mitigates any possible harm stemming from a reasonable restraint on their current personal assets of the sort IFIC is requesting here.

Clearly, the law of suretyship promotes a policy of requiring the bond principal and the indemnitors to primarily shoulder the burden of satisfying liabilities which also attach to the surety. The surety is without fault when it performs the duties and obligations of the principal as a result of the principal's default. The equitable doctrines invoked by IFIC herein, and in its Complaint, are grounded in the notions that a bond principal has the primary duty to pay its debts, and that the surety is to be relieved from liability. See Western World Ins. Co. v. Travelers Indemnity Co., 358 So.2d 602, 604 (Fla. 1st DCA 1978)

The rights of the surety to indemnification, and injunctive measures to ensure the same, should be strongly enforced to continue the incentives for such entities to act as sureties. Like letters of credit, suretyship facilitates commerce by making it unnecessary for parties to trust each other before contracting for construction services. Further, protecting the rights of sureties, in turn, protects the rights of project owners, subcontractors, and suppliers by providing assurances that project liabilities and debts are satisfied.

The importance of the surety is underscored in the public works arena. Suppliers and subcontractors cannot file liens on public property. See § 713.01, et seq., Fla. Stat. Further, taxpayers should not be burdened with additional construction costs which may be incurred by a public agency as a result of default by a contractor in the absence of surety bonding. As a result, the law of the State of Florida requires that performance and payment bonds be issued on certain public works contracts. See § 255.05, Fla. Stat.

In the instant case, Crisal was constructing new classrooms for and renovating The Phillis Wheatley Elementary School. IFIC has been called upon to complete the construction contract as a result of Crisal's default and ultimate termination. In fact, Crisal has ceased all business

15

operations.  IFIC now faces uncertain and possibly substantial losses as a result of the Bonds issued on behalf of Crisal.  Despite agreeing to do so, Crisal and the other indemnitors have refused to exonerate IFIC for its potential losses.  Further, Defendant Ovidio P. Rodriguez has begun dissipating valuable assets in the face of IFIC's demand for exoneration.  Preventing the dissipation of assets in the manner requested ensures that sureties, such as IFIC, are reimbursed for losses incurred for payments made to the subcontractors and suppliers on public construction projects who would have no other recourse if the principal has become insolvent or is otherwise defunct.  Additionally, granting the requested relief ensures that sureties, such as IFIC, are reimbursed for losses incurred in performing its obligations to public agencies to complete public construction projects or otherwise remedy the default of a contractor.  The enforcement of its equitable and legal rights against its principal and indemnitors provides the surety with incentive to continue to provide bonding for the protection of subcontractors, suppliers, public and/or governmental agencies and the public in general.  Thus, granting the equitable relief requested is in the public interest.

## IV.    CONCLUSION

For the foregoing reasons, and any other reasons this Court may find, Plaintiff IFIC

respectfully requests that this Court enter the attached proposed Temporary Restraining Order.

Respectfully submitted,

Neal L. Henrichsen, Esq.
Florida Bar No.: 0111503
Helen H. Albee, Esq.
Florida Bar No.: 987247
Henrichsen Siegel Moore, P.L.L.C.
200 E. Forsyth Street
Jacksonville, Florida 32202
(904) 355-2233
(904) 596-5705 (fax)
Nhenrichsen@hslawyers.com

17

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Case No. 02-23106-CIV-MOORE

|  |  |
|---|---|
| INTERNATIONAL FIDELITY<br>INSURANCE COMPANY<br><br>    Plaintiff,<br><br>v.<br><br>CRISAL CONSTRUCTION CO.,<br>INC., a Florida corporation,<br>OVIDIO P. RODRIGUEZ,<br>ALICIA MARTI RODRIGUEZ,<br>WILLIAM D. REAL, and<br>CRISTINA M. REAL<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF FRANCIS WHELAN

I, FRANCIS WHELAN, being duly sworn, depose and say:

1.    I am competent to testify to the facts stated herein and have personal knowledge of such facts and by virtue of my review of International Fidelity Insurance Company's business records kept in the ordinary course of business.

2.    I am Claims Manager for International Fidelity Insurance Company ("IFIC").

3.    IFIC is a company organized and existing under the laws of the State of New Jersey with its principal place of business in Newark, New Jersey.  IFIC is duly licensed, qualified, and authorized to engage in the business of issuing surety bonds in the State of Florida, as well as in other states.

8.    On or about November 3, 2000, Defendant Crisal, as "Contractor," and Defendants Ovidio P. Rodriguez, Alicia Marti Rodriguez, William D. Real and

Cristina M. Real, as "Indemnitors," executed an Agreement of Indemnity in favor of IFIC, as "Surety," as an inducement for and in consideration of the issuance of surety bonds on behalf of Crisal. A true and exact copy of the Agreement of Indemnity is attached hereto as Exhibit 1.

4.     Prior to entering into a bonding relationship with Crisal, IFIC's underwriting department reviewed the financial statements and records of Crisal and the indemnitors and relied on same in issuing the bonds on behalf of Crisal and executing the Agreement of Indemnity.

5.     Alicia Marti Rodriguez is the President of Crisal. According to the Rodriguez's own financial records, Ovidio and Alicia Marti Rodriguez invested a large amount of money in Crisal. William J. Real is Crisal's Vice President and upon information and belief, controlled the day-to-day operations of Crisal.

6.     On or about June 26, 2001, IFIC, as surety, issued Public Construction Performance and Guarantee Bond and Public Construction Payment Bond No. 0318012 (the "Bonds"), on behalf of Defendant Crisal Construction Co., Inc. ("Crisal"), as principal, for the School Board of Miami Dade County, Florida's Project No. A-0654, commonly known as the Phillis Wheatley Elementary School, Renovations and Additions (the "Wheatley Project").

7.     The Bonds guaranteed Defendant Crisal's performance of its contractual obligations on the Wheatley Project, as well as Defendant Crisal's payment to those providing it with labor and/or materials for the Wheatley Project.

8.     Pursuant to the Agreement of Indemnity, each of the Defendants agreed, among other things, to the following indemnity provision:

## INDEMNITY

The Contractor [Crisal] and Indemnitors shall exonerate, indemnify, and keep indemnified the Surety [IFIC] from and against any and all liability for losses and/or expenses of whatsoever kind or nature (including, but not limited to, interest, court costs and counsel fees) and from and against any and all such losses and/or expenses which the Surety may sustain and incur: (1) By reason of having executed or procured the execution of the Bonds, (2) By reason of the failure of the Contractor or Indemnitors to perform or comply with the covenants and conditions of this Agreement or (3) In enforcing any of the covenants and conditions of this Agreement. Payment by reason of the aforesaid causes shall be made to the Surety by the Contractor and Indemnitors as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor. Such payment shall be equal to the amount of the reserve set by Surety. In the event of any payment by the Surety the Contractor and Indemnitors further agree that in any accounting between the Surety and the Contractor, or between the Surety and the Indemnitors, or either or both of them, the Surety shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters herein contemplated by this Agreement under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of the liability to the Surety.

9.      By letter dated August 20, 2002, the Project Coordinator, Region IV, Office of

Capital Improvement Projects for the School Board of Miami-Dade County,

Florida (the "School Board") notified Crisal and IFIC that termination of Crisal

on the Wheatley Project was being recommended to the School Board of Miami-

Dade County, Florida. This recommendation was to be approved at its September

11, 2002 Board meeting. The Board meeting was actually held on September 12,

2002.

10.     By letter dated September 5, 2002, IFIC requested information from Crisal and

the other indemnitors regarding any defenses to the termination from the

3

Wheatley Project and their anticipated course of action. By letter dated September 13, 2002, Crisal, through its president, Alicia Marti Rodriguez, alleged it had a defense against its termination. However, as of the date of this Affidavit, neither Crisal nor the other indemnitors have provided any substantive information from which IFIC can properly evaluate the Performance and Guarantee Bond claim or formulate a defense to the termination of Crisal from the Wheatley Project.

11.     Defendant Crisal was officially terminated from the Wheatley Project by the School Board at its September 12, 2002 Board meeting. By letter dated September 13, 2002, the School Board called upon IFIC to perform its obligations under the Contract and the Performance Bond.

12.     In addition to the School Board's Performance Bond claim, IFIC has received claims under the payment bond that IFIC issued on behalf of Defendant on the Wheatley Project. Further, IFIC expects to receive numerous, additional payment bond claims in the future.

13.     In response to the claims it received under the Bonds, IFIC hired construction consultant Lovett, Silverman and Associates ("Lovett, Silverman") to analyze the status of the Projects, the business operations of Defendant Crisal, and the financial position of Defendant Crisal as it relates to the Project.

14.     In the course of its investigation, Lovett-Silverman undertook, among other things, the following: (1) interviewing key personnel at Defendant Crisal's home office; (2) reviewing financial and other documentation relating to the Wheatley Project; (3) visiting and inspecting the work in progress on Wheatley Project; and

4

(4) meeting with key construction personnel at the job sites of the Wheatley Project.

15.  Upon information and belief, Defendant Crisal has ceased all operations. Upon information and belief, Defendant William Real, who was primarily responsible for prosecuting the work on the Wheatley Project, has abandoned his responsibilities and obligations to Crisal.

16.  Based upon the investigation and analysis of Lovett, Silverman, IFIC has set reserves for the Wheatley Project in the amount of $200,000. The reserve amount reflects Defendant Crisal's outstanding accounts payable on the Wheatley Project, plus the estimated cost to complete the Wheatley Project, less any remaining funds in Defendant Crisal's contract on the Wheatley Project. IFIC's posting of these reserves is recorded in the financial records of IFIC the same as if IFIC has actually paid the full amount of the reserves. Accordingly, the reserves affect the ability of IFIC to issue bonds in the same manner as if a loss payment has actually been made.

17.  IFIC has received and will likely continue to receive numerous claims under the Payment Bond issued on behalf of Defendant Crisal, and IFIC has been called upon by the School Board to take over and complete the Wheatley Project as a result of Crisal's default and termination. In spite of these facts, Defendant Ovidio Rodriguez has begun dissipating his nonexempt assets, namely a large commercial warehouse in Miami Dade County, Florida. According to the public records of Dade County, Florida, this piece of property was sold on August 30, 2002, ten days after Crisal was terminated from the Wheatley Project and after a

5

meeting with IFIC regarding the termination.

18.   By letters dated September 5, 2002 and September 12, 2002, IFIC informed all of the Defendants of the claims asserted under the Bonds, and reminded the Defendants of their obligations under the Agreement of Indemnity. True and exact copies of these letters are attached hereto as Composite Exhibit 2.

19.   By letter dated October 3, 2002, demand, through counsel, was made upon all of the Defendants to place IFIC in funds in the amount of reserve it had set as a result of the claims it had received under the Bonds. A true and exact copy of the October 3, 2002 letter is attached hereto as Exhibit 3.

20.   To date, the Defendants have failed to place IFIC in funds, property, or other security in the amount of the reserves set by IFIC pursuant to its demand. Consequently, the Defendants are in breach of the Agreement of Indemnity.

21.   To date, the Defendants have failed to indemnify IFIC. Thus, the Defendants have failed to provide the security IFIC bargained for under the Agreement of Indemnity, and are therefore in breach of the Agreement of Indemnity.

22.   IFIC, having been deprived the security afforded by the Agreement of Indemnity, has already incurred attorney's fees, costs, and expenses under the Bonds and due to its ongoing efforts to enforce the Agreement of Indemnity. IFIC also expects to incur future losses, fees, costs, and expenses under the Bonds and due to its ongoing efforts to enforce the Agreement of Indemnity.

23.   IFIC justifiably fears that the actions to dissipate the assets of Defendants Ovidio and Alicia Rodriguez, upon which IFIC relied in issuing bonds on behalf of Defendant Crisal, will leave insufficient assets to satisfy IFIC's legal and

6

equitable rights against the Defendants Crisal, Ovidio P. Rodriguez and Alicia Marti Rodriguez.

24.     By virtue of the actions of Defendant Ovidio P. Rodriguez described herein, IFIC will suffer irreparable harm if Defendants Crisal, Ovidio P. Rodriguez and Alicia Marti Rodriguez are not restrained from selling, transferring, further encumbering, or otherwise disposing of their respective assets during the pendency of IFIC's lawsuit against the five named Defendants.

25.     At this juncture, it is not practical to provide notice and a hearing with respect to IFIC's request for injunctive relief, because IFIC reasonably believes that such notice could result in the immediate transfer and/or dissipation of other assets by Defendants Crisal, Ovidio P. Rodriguez and Alicia Marti Rodriguez.

**FURTHER AFFIANT SAITH NOT.**

Francis Whelan

Sworn and subscribed before me this
____ day of October, 2002.

NOTARY PUBLIC [seal]

My commission expires _____

MARTA ROCHA
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires April 7, 2007

7

# EXHIBIT 1

# AGREEMENT OF INDEMNITY

THIS AGREEMENT of Indemnity, made and entered into this 3rd day of November 2000 by **Crisal Construction Company Inc.** 4661 S W 71st Avenue, Miami, Florida 33155 (hereinafter called the Contractor) Crisal Construction Company Inc. and Alicia Marti Rodriguez and Ovidio P. Rodriguez, 7101 S W 69 Avenue, Miami, Florida 33143 and William D. Real and Cristina M. Real, 5729 S W 55th Street, Miami, Florida 33155 (hereinafter called the Indemnitors, if any) and INTERNATIONAL FIDELITY INSURANCE COMPANY, One Newark Center, 20th Floor, Newark, New Jersey 07102 (hereinafter called Surety),

## WITNESSETH:

WHEREAS, the Contractor, in the performance of contracts and the fulfillment of obligations generally, whether in its own name solely or as co-adventurer with others, may desire, or be required to give or procure certain surety bonds, undertakings or instruments of guarantee, and to renew, or continue or substitute the same from time to time; or new bonds, undertakings or instruments of guarantee with the same or different penalties, and/or conditions, may be desired or required, in renewal, continuation, extension or substitution thereof; any one or more of which are hereinafter called Bonds; or the Contractor or Indemnitors may request the Surety to refrain from canceling said Bonds; and

WHEREAS, at the request of the Contractor and the Indemnitors and upon the express understanding that this Agreement of Indemnity should be given, the Surety has executed or procured to be executed, and may from time to time hereafter execute or procure to be executed, said Bonds on behalf of the Contractor; and

WHEREAS, the Underwriters have a substantial, material and beneficial interest in the obtaining of the Bonds or in the Surety's refraining from canceling said Bonds.

NOW, THEREFORE, in consideration of the premises the Contractor and Indemnitors for themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, hereby covenant and agree with the Surety, its successors and assigns, as follows:

## PREMIUMS

FIRST:     The Contractor and Indemnitors will pay to the Surety in such manner as may be agreed upon all premiums and charges of the Surety for the Bonds in accordance with its rate filings, its manual of rates, or as otherwise agreed upon, until the Contractor or Indemnitors shall serve evidence satisfactory to the Surety of its discharge or release from the Bonds and all liability by reason thereof.

## INDEMNITY

SECOND:     The Contractor and Indemnitors shall exonerate, indemnify, and keep indemnified the Surety from and against any and all liability for losses and/or expenses of whatsoever kind or nature (including, but not limited to, interest, court costs and counsel fees) and from and against any and all such losses and/or expenses which the Surety may sustain and incur: (1) By reason of having executed or procured the execution of the Bonds, (2) By reason of the failure of the Contractor or Indemnitors to perform or comply with the covenants and conditions of this Agreement or (3) In enforcing any of the covenants and conditions of this Agreement. Payment by reason of the aforesaid causes shall be made to the Surety by the Contractor and Indemnitors as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefor. Such payment shall be equal to the amount of the reserve set by the Surety. In the event of any payment by the Surety the Contractor

and Indemnitors further agree that in any accounting between the Surety and the Contractor, or between the Surety and the Indemnitors, or either or both of them, the Surety shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters herein contemplated by this Agreement under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of the liability to the Surety.

## ASSIGNMENT

THIRD:        The Contractor, the Indemnitors hereby consenting, will assign, transfer and set over, and does hereby assign, transfer and set over to the Surety, as collateral, to secure the obligations in any and all of the paragraphs of this Agreement and any other indebtedness and liabilities of the Contractor to the Surety, whether heretofore or hereafter incurred, the assignment in the case of each contract to become effective as of the date of the bond covering such contract, but only in the event of (1) any abandonment, forfeiture or breach of any contracts referred to in the Bonds or of any breach of any said Bonds- or (2) of any breach of the provisions of any of the paragraphs of this Agreement; or (3) of a default in discharging such other indebtedness or liabilities when due; or (4) of any assignment by the Contractor for the benefit of creditors' or of the appointment, or of any application for the appointment, of a receiver or trustee for the Contractor whether insolvent or not; or (5) of any proceeding which deprives the Contractor of the use of any of the machinery, equipment, plant, tools or material referred to in section (b) of this paragraph; or (6) of the Contractor's dying, absconding, disappearing, incompetency, being convicted of a felony, or imprisoned if the Contractor be an individual- (a) All the rights of the Contractor in, and growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any manner out of the Bonds; (b) All the rights, title and interest of the Contractor in and to all machinery, equipment, plant, tools and materials which are now, or may hereafter be, about or upon the site or sites of any and all of the contractual work referred to in the Bonds or elsewhere, including materials purchased for or chargeable to any and all contracts referred to in the bonds, materials which may be in process of construction, in storage elsewhere, or in transportation to any and all of said sites; (c) All the rights, title and interest of the Contractor in and to all subcontracts let or to be let in connection with any and all contracts referred to in the Bonds, and in and to all surety bonds supporting such subcontracts; (d) All actions, causes of actions, claims and demands whatsoever which the Contractor m3y have or acquire against any subcontractor, laborer or materialman, or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools or other equipment in connection with or on account of any and all contracts referred to in the Bonds; and against any surety or sureties of any subcontractor, laborer, or materialman; (e) Any and all percentages retained and any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Contractor has an interest.

## TRUST FUND

FOURTH:        If any of the Bonds are executed in connection with a contract which by its terms or by law prohibits the assignment of the contract price, or any part thereof, the Contractor and Indemnitors covenant and agree that all payments received for or on account of said contract shall be held as a trust fund in which the Surety has an interest, for the payment of obligations incurred in the performance of the contract and for labor, materials, and services furnished in the prosecution of the work provided in said contract or any authorized extension or modification thereof; and, further, it is expressly understood and declared that all monies due and to become due under any contract or contracts covered by the Bonds are trust funds, whether in the possession of the Contractor or Indemnitors or otherwise, for the benefit of and for payment of all such obligations in connection with any such contract or contracts for which the Surety would be liable under any of said Bonds, which said trust also inures to

the benefit of the Surety for any liability or loss it may have or sustain under any said Bonds, and this Agreement and declaration shall also constitute notice of such trust.

## UNIFORM COMMERCIAL CODE

FIFTH:        That this Agreement shall constitute a Security Agreement to the Surety and also a Financing Statement, both in accordance with the provisions of the Uniform Commercial Code of every jurisdiction wherein such Code is in effect and may be so used by the Surety without in any way abrogating, restricting or limiting the rights of the Surety under this Agreement or under law, or in equity.

## TAKEOVER

SIXTH:        In the event of any breach, delay or default asserted by the obligee in any said Bonds, or the Contractor has suspended or ceased work on any contract or contracts covered by any said Bonds, or failed to pay obligations incurred in connection therewith, or in the event of the death, disappearance, Contractor's conviction for a felony, imprisonment, incompetency, insolvency, or bankruptcy of the Contractor, or the appointment of a receiver or trustee for the Contractor, or the property of the Contractor, or in the event of an assignment for the benefit of creditors of the Contractor, or if any action is taken by or against the Contractor under or by virtue of the National Bankruptcy Act, or should reorganization or arrangement proceedings be filed by or against the Contractor under said Act, or if any action is taken by or against the Contractor under the insolvency laws of any state, possession, or territory of the United States the Surety shall have the right, at its option and in its sole discretion and is hereby authorized, with or without exercising any other right or option conferred upon it by law or in the terms of this Agreement, to take possession of any part or all of the work under any contract or contracts covered by any said Bonds, and at the expense of the Contractor and Indemnitors to complete or arrange for the completion of the same, and the Contractor and Indemnitors shall promptly upon demand pay to the Surety all losses, and expenses so incurred.

## CHANGES

SEVENTH:     The Surety is authorized and empowered, without notice to or knowledge of the Indemnitors to assent to any change whatsoever in the Bonds, and/or any contracts referred to in the Bonds, and/or in the general conditions, plans and/or specifications accompanying said contracts, including, but not limited to, any change in the time for the completion of said contracts and to payments or advances thereunder before the same may be due, and to assent to or take any assignment or assignments, to execute or consent to the execution of any continuations, extensions or renewals of the Bonds and to execute any substitute or substitutes therefor, with the same or different conditions, provisions and obligees and with the same or larger or smaller.penalties, it being expressly understood and agreed that the Indemnitors shall remain bound under the terms of this Agreement even though any such assent by the Surety does or might substantially increase the liability of said Indemnitors.

## ADVANCES

EIGHTH:      The Surety is authorized and empowered to guarantee loans, to advance or lend to the Contractor any money, which the Surety may see fit, for the purpose of any contracts referred to in, or guaranteed by the Bonds; and all money expended in the completion of any such contracts by the Surety, or lent or advanced from time to time to the Contractor, or guaranteed by the Surety for the purposes of any such contracts, and all costs, and expenses incurred by the Surety in relation thereto, unless repaid with legal interest by the Contractor to the Surety when due, shall be presumed to be a loss by the Surety for which the Contractor and the Indemnitors shall be responsible, notwithstanding that said money or any part thereof should not be so used by the Contractor.

## BOOKS AND RECORDS

NINTH:        At any time, and until such time as the liability of the Surety under any and all said Bonds is terminated, the Surety shall have the right to reasonable access to the books, records, and accounts of the Contractor and Indemnitors; and any bank depository, materialman, supply house, or other person, firm, or corporation when requested by the Surety is hereby authorized to furnish the Surety any information requested including, but not limited to, the status of the work under contracts being performed by the Contractor, the condition of the performance of such contracts and payments of accounts.

## DECLINE EXECUTION

TENTH:        Unless otherwise specifically agreed in writing, the Surety may decline to execute any Bond and the Contractor and Indemnitors agree to make no claim to the contrary in consideration of the Surety's receiving this Agreement; and if the Surety shall execute a Bid or Proposal Bond, it shall have the right to decline to execute any and all of the bonds that may be required in connection with any award that may be made under the proposal for which the Bid or Proposal Bond is given and such declination shall not diminish or alter the liability that may arise by reason of having executed the Bid or Proposal Bond.

## NOTICE OF EXECUTION

ELEVENTH: The Indemnitors hereby waive notice of the execution of said Bonds and of the acceptance of this Agreement, and the Contractor and the Indemnitors hereby waive all notice of any default, or any other act or acts giving rise to any claim under said Bonds, as well as notice of any and all liability of the Surety under said Bonds, and any and all liability on their part hereunder, to the end and effect that, the Contractor and the Indemnitors shall be and continue liable hereunder, notwithstanding any notice of any kind to which they might have been or be entitled, and notwithstanding any defenses they might have been entitled to make.

## SETTLEMENTS

TWELFTH:        The Surety shall have the right to adjust, settle or compromise any claim, demand, suit or judgment upon the Bonds, unless the Contractor and the Indemnitors shall request the Surety to litigate such claim or demand, or to defend such suit, or to appeal from such judgment, and shall deposit with the Surety, at the time of such request, cash or collateral satisfactory to the Surety in kind and amount, to be used in paying any judgment or judgments rendered or that may be rendered, with interest, costs, expenses and attorneys' fees, including those of the Surety.

## SURETIES

THIRTEENTH:In the event the Surety procures the execution of the Bonds by other sureties, or executes the Bonds with co-sureties, or reinsures any portion of said Bonds with reinsuring sureties, then all the terms and conditions of this Agreement shall inure to the benefit of such other sureties, co-sureties and reinsuring sureties, as their interests may appear.

## SUITS

FOURTEENTH:        Separate suits may be brought hereunder as causes of action accrue, and the bringing of suit or the recovery of judgment upon any cause of action shall not prejudice or bar the bringing of other suits upon other causes of action, whether theretofore or thereafter arising.

## OTHER INDEMNITY

**FIFTEENTH:** That the Contractor and the Indemnitors shall continue to remain bound under the terms of this Agreement even though the Surety may have from time to time heretofore or hereafter, with or without notice to or knowledge of the Contractor and the Indemnitors, accepted or released other agreements of indemnity or collateral in connection with the execution or procurement of said Bonds, from the Contractor or Indemnitors or others, it being expressly understood and agreed by the Contractor and the Indemnitors that any and all other rights which the Surety may have or acquire against the Contractor and the Indemnitors and/or others under any such other or additional agreements of indemnity or collateral shall be in addition to, and not in lieu of, the rights afforded the Surety under this Agreement.

## INVALIDITY

**SIXTEENTH:** In case any of the parties mentioned in this Agreement fail to execute the same, or in case the execution hereof by any of the parties be defective or invalid for any reason, such failure, defect or invalidity shall not in any manner affect the validity of this Agreement or the liability hereunder of any of the parties executing the same, but each and every party so executing shall be and remain fully bound and liable hereunder to the same extent as if such failure, defect or invalidity had not existed. It is understood and agreed by the Contractor and Indemnitors that the rights, powers, and remedies given the Surety under this Agreement shall be and are in addition to, and not in lieu of, any and all other rights, powers, and remedies which the Surety may have or acquire against the Contractor and Indemnitors or others whether by the terms of any other agreement or by operation of law or otherwise.

## ATTORNEY IN FACT

**SEVENTEENTH:** The Contractor and Indemnitors hereby irrevocably nominate, constitute, appoint and designate the Surety as their attorney-in-fact with the right, but not the obligation, to exercise all of the rights of the Contractor and Indemnitors assigned, transferred and set over to the Surety in this Agreement, and in the name of the Contractor and Indemnitors to make, execute, and deliver any and all additional or other assignments, documents or papers deemed necessary and proper by the Surety in order to give full effect not only to the intent and meaning of the within assignments, but also to the full protection intended to be herein given to the Surety under all other provisions of this Agreement. The Contractor and Indemnitors hereby ratify and confirm all acts and actions taken and done by the Surety as such attorney-in-fact.

## TERMINATION

**EIGHTEENTH:** This Agreement may be terminated by the Contractor or Indemnitors upon twenty days' written notice sent by registered mail to the Surety at its home office at One Newark Center, Newark, New Jersey 07102, but any such notice of termination shall not operate to modify, bar, or discharge the Contractor or the Indemnitors as to the Bonds that may have been theretofore executed.

**NINETEENTH:** This Agreement may not be changed or modified orally. No change or modification shall be effective unless made by written endorsement executed to form a part hereof.

IN WITNESS WHEREOF, we have hereunto set our hands and seals the day and year first above written.

ATTEST OR WITNESS:     Crisal Construction Company Inc.
                       4661 S W 71st Avenue
                       Miami, Florida  33155

                       65-0566977 Federal Tax I.D. Number

.............................  By ........................................................ (SEAL)
                              (Signature of Corporate President)
                              Alicia Marti Rodriguez , President

.............................  By ........................................................ (SEAL)
                              (Signature of Indemnitor)

                       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 Social Security Number

                       Alicia Marti Rodriguez, 7101 S W 69th Avenue, Miami, Florida  33143

.............................  By ........................................................ (SEAL)
                              (Signature of Indemnitor)

                       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 Social Security Number

                       Ovidio P. Rodriguez, 7101 S W 69th Avenue, Miami, Florida  33143

.............................  By ........................................................ (SEAL)
                              (Signature of Indemnitor)

                       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 Social Security Number

                       William D. Real, 5729 S W 55th Street, Miami, Florida  33155

.............................  By ........................................................ (SEAL)
                              (Signature of Indemnitor)

                       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 Social Security Number

                       Cristina M. Real, 5729 S W 55th Street, Miami, Florida,  33155

INTERNATIONAL FIDELITY INSURANCE COMPANY
           (SURETY)

.......................................................  By.................................................... (SEAL)
                              Ronald C. Opferman, Attorney In Fact

## For Acknowledgment of Contractor's Signature

### INDIVIDUAL ACKNOWLEDGMENT

STATE OF .... Florida

COUNTY OF .... Miami-Dade

} ss:

On this .......... 3rd .......... day of .......... November .......... in the year 19.. 2000 before me personally come(s)
Alicia M. Rodriguez; Ovidio P. Rodriguez; William D. Real; Cristina M. Real,
to me known and known to me to be the person(s) who (is) (are) described in and who executed the foregoing instrument and acknowledge(s)
to me that.... the y.  executed the same.

.................................................
(Signature and title of official taking acknowledgement/ Notary)

*OFFICIAL NOTARY SEAL
GISEL M GONZALEZ
COMMISSION NUMBER
CC908936
MY COMMISSION EXPIRES
FEB. 8, 2004*

### CORPORATE ACKNOWLEDGMENT

STATE OF .... Florida

COUNTY OF .... Miami-Dade

} ss:

On this .......... 3rd .......... day of .......... November .......... in the year 19.. 2000 before me personally come(s)
Alicia M. Rodriguez
to me known who, being by me duly sworn, deposes and says that he resides in the City of .... Miami
that he is the .......... President .......... of the .... Crisal Construction Co., Inc.
the corporation described in and which executed the foregoing instrument; that he knows the seal of the said corporation; that the seal affixed
to the said instrument is such corporate seal; that it was so affixed by the order of the Board of Directors of said corporation, and that he
signed his name thereto by like order.

.................................................
(Signature and title of official taking acknowledgment/ Notary)

*OFFICIAL NOTARY SEAL
GISEL M GONZALEZ
COMMISSION NUMBER
CC908936
MY COMMISSION EXPIRES
FEB. 8, 2004*

### INDIVIDUAL ACKNOWLEDGMENT

STATE OF ........................................

COUNTY OF ......................................

} ss:

On this .......................... day of ........................................., in the year 19...... before me personally come(s)
..........................................................................................................................................................,
to me known and known to me to be the person(s) who (is) (are) described in and who executed the foregoing instrument and acknowledge(s)
to me that...... he..... executed the same.

.................................................
(Signature and title of official taking acknowledgment/ Notary)

Form 184

# EXHIBIT B

1991 U.S. Dist. LEXIS 951, *

LEXSEE 1991 u.s. dIST. leXIS 951

**EMPLOYERS INSURANCE OF WAUSAU, Plaintiff, v. LORNA D. BOND, Defendant**

**Civil Action No. HAR-90-1139**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

*1991 U.S. Dist. LEXIS 951*

**January 25, 1991, Decided**

**COUNSEL:**
[*1]

John A. Whitney, *McGuffie, Greif, Whitney & Handal,* Washington, DC, for plaintiff.

Richard I. Kovelant, Laurel, Maryland, for defendant.

**JUDGES:**
John R. Hargrove, United States District Judge.

**OPINIONBY:**
HARGROVE

**OPINION:**

MEMORANDUM OPINION

Currently pending before this Court is Plaintiff Employers Insurance of Wausau's ("Wausau") Motion for Partial Summary Judgment. This issues have been fully briefed. No response is deemed necessary. Local Rule 105.6 (D. Md.).

Wausau is a mutual company incorporated in Wisconsin. Defendant Lorna D. Bond ("Mrs. Bond") is a citizen of Maryland. The amount in controversy exceeds $ 50,000. This Court has proper jurisdiction over this matter under diversity of citizenship. *42 U.S.C. § 1332.*

I.

Wausau is a surety company which wrote performance and payment bonds for construction projects being carried out by Mech-Con Corporation ("Mech-Con"). On June 29, 1987, Mech-Con, through its owner, Albert Bond, Jr., ("Mr. Bond") along with Mr. Bond and the Defendant, individually, entered into a General Indemnity Agreement ("contract") with Wausau in order to obtain issuance of the bonds. Mr. Bond and Mech-Con have each declared bankruptcy. Mr. and Mrs. Bond separated on February [*2] 15, 1988.

On April 24, 1990, Plaintiff filed suit for specific performance of it contract with Mrs. Bond. n1 By affidavit of L. Neal Foxhall, Wausau Assistant Vice President for Surety Claims, Plaintiff asserts that it has set up a reserve of $ 193,106.50, to cover future losses on five (5) Mech-Con bonds. Wausau has made a demand for deposit of this amount, as provided in the contract. n2 Plaintiff's Exhibit 2. The surety has already paid out $ 174,111.70 on its bonds with Mech-Con. Of this amount, Plaintiff has recovered $ 2,795.20, leaving its present loss on the bonds at $ 171,316.50.

n1 Due to the bankruptcy, Mech-Con and Mr. Bond are not named defendants in this suit.

n2 The contract provides that:

3. If the Surety shall set up a reserve to cover any liability, claim asserted, suit or judgment under any such bond, the Indemnitors will, immediately upon demand and whether or not the Surety shall have made any payment therefor, deposit with the Surety a sum of money equal to such reserve and any increase thereof as collateral security on such bond, and such sum and any other money or property which shall have been or shall hereafter be pledged as collateral security on any such bond shall be available, at the discretion of the Surety, as collateral security on all bonds coming within the scope of this instrument or for any other indebtedness of the Indemnitors to the Surety; and any such collateral security shall be held subject to the terms of the Surety's regular form of receipt for collateral, which is by reference made a part thereof.

1991 U.S. Dist. LEXIS 951, *

Plaintiff's Exhibit 1, at 1.

[*3]

Plaintiff seeks to compel Mrs. Bond to deposit $ 193,106.50 to cover the reserve that it has been forced to set up to cover future losses under the bonds. Wausau made a demand of deposit, as required under the contract. To date, Mrs. Bond and her co-indemnitors have deposited nothing with Wausau to cover the reserve. Wausau also moves this Court to enter judgment on the $ 171,316.50 it has already paid out, with this amount to be collected from the reserve.

In her opposition to Plaintiff's Motion for Partial Summary Judgment, Defendant admits that she executed the contract. Furthermore, Mrs. Bond apparently concedes that Wausau would be entitled to the judgment it is seeking if the contract were valid, as this assertion by Wausau is unchallenged in Defendant's opposition. n3 However, Defendant asserts that the contract was made under duress and coercion due to the alleged abuse and threats to which her husband subjected her. Mrs. Bond maintains that the claimed duress makes the contract void and, therefore, constitutes a valid defense to Plaintiff's cause of action.

n3 Defendant does assert that "there may be a dispute as to the sums claimed to be alleged to be due and owing." See Defendant's Statement of Material Facts at 1. However, this statement does not contradict the Plaintiff's affidavit concerning the amount due and owing, nor has Defendant provided this Court with any other evidence showing that the amount claimed is in error. Therefore, for the purpose of this Motion, the Court will accept Plaintiff's figures as accurate and unchallenged.

[*4]

II.

Summary judgment will be granted when "there is no genuine issue as to any material fact, and if the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).* Courts do not "weigh the evidence and determine the truth of the matter." *Id., 477 U.S. at 249.* However, "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id., 477 U.S. at 248.* The mere existence of a "scintilla of evidence" is not enough to frustrate a motion for summary judgment. In order to defeat a motion for summary judgment, the pleadings must show evidence in which the finder of fact could reasonably

find for the party opposing judgment. *Id., 477 U.S. at 252; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).*

A.

There are two general types of cases in which courts have found an agreement was made under duress. The first type, physical inducement, involves cases in which a person executes an agreement under actual bodily force or the equivalent. Contracts formed under these circumstances are considered void regardless of the who placed the victim under the duress. Restatement (Second) of Contracts § [*5] 174. n4

n4 Restatement (Second) of Contracts § 174, When Duress by Physical Compulsion Prevents Formation of a Contract, states that:

If conduct that appears to be a manifestation of assent by a party who does not intend to engage in that conduct is physically compelled by duress, that conduct is not effective as a manifestation of assent.

The second form of duress is found when an assent to a contract is due to an improper threat which leaves the victim with no reasonable alternative other than to execute the agreement. Contracts formed in this manner are voidable when the opposing party to the transaction caused, or was privy to, the victim's duress. However, where the assent was induced by a third-party unrelated to the transaction and the opposing party to the transaction, without knowledge of the victim's duress, materially relied upon the victim's assent, the contract is not voidable. Restatement (Second) of Contracts § 175. n5 This form of duress most often arises in employment contracts or in the form of economic [*6] duress.

n5 Restatement (Second) of Contracts § 175, When Duress by Threat Makes a Contract Voidable:

(1) If a part's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim.

(2) If a part's manifestation of assent is induced by one who is not a party to the transaction, the contract is voidable by the victim unless the other party to the transaction in good faith and without reason to know of the duress either gives value or relies materially on the transaction.

1991 U.S. Dist. LEXIS 951, *

Maryland courts have recognized both forms of duress. In *Central Bank of Frederick v. Copeland, 18 Md. 305, 317-18 (1862)*, the Maryland Court of Appeals adopted the form of duress now found in Restatement (Second) of Contracts § 174. Maryland courts have cited Copeland on several occasions. See, e.g., *Blum v. Blum, 59 Md.App. 584, 594 (1984); Bell v. Bell, 38 Md.App. 10, 16 (1977)*. The second and more common form of duress has been [*7] implicitly recognized by the Maryland courts in a number of opinions. See *Food Fair Stores, Inc. v. Joy, 283 Md. 205, 216-18 (1978); Meredith v. Talbot County, 80 Md.App. 174, 183 (1989); Eckstein v. Eckstein, 38 Md.App. 506, 512 (1978); Saggese v. Saggese, 15 Md.App. 378, 388 (1972).* n6

n6 The Maryland Court of Appeals in Food Fair Stores and the Court of Special Appeals in Eckstein cite both duress provisions from the tentative draft of the Restatement (Second) of Contracts, now codified as § § 174-175. However, the elements of duress later stated by the courts and the text of each opinion make it clear that these cases fit into the second category of duress.

B.

There is no assertion nor even suggestion that Plaintiff was a party to, or took advantage of, Mr. Bond's alleged actions, nor that Wausau was even aware of them. Therefore, the sufficiency of Mrs. Bond's defense turns on the type of alleged duress suffered by her, if any is found. "The determination of duress is dependent upon the [*8] circumstances of each individual case." *Eckstein, 38 Md.App. at 514.*

In support of her opposition to Wausau's Motion for Partial Summary Judgment, Mrs. Bond has provided this Court with the affidavit of Mrs. Bond and with a copy of interrogatories from a separate action presently being litigated in this Court. n7 In her affidavit, Mrs. Bond alleges that:

5. My husband threatened me with bodily harm and injury if I did not sign papers relating to his business which were associated with bonding and other loan requirements.

6. I was never offered any explanation as to what the limited guaranty I signed was about, but I was threatened that if it was not signed he would physically attack me, break up household items and throw me out of the house.

Affidavit of Lorna A. Bond at 1. No details specific to

the signing of the contract with Wausau is given.

n7 In that case, United States for the Use and Benefit of H. G. Kogok Co. v. Bond (MJG-89-2109), Mrs. Bond is also claiming that she signed a note of security on a bond under duress caused by her husband.

Defendant has not labeled this submission to the Court. For purposes of this Motion, the Court will term the interrogatory answers as Defendant's Exhibit 1.

[*9]

Defendant's Exhibit 1 also provides no specific details concerning abuse which lead her to sign the agreement with Wausau. Instead, she states that there was a general pattern of abuse during the period in which the loan agreement was signed:

No one ever witnessed the abuse that Albert put me through. He came home, as he always did with these papers and told me to take them to Evelyn Coombs at the Post Office, sign them, get them notarized and bring them straight back as fast as possible. He met me in the driveway, took the papers, had his truck driver waiting, he gave them to Calvin Moon, the truck driver to deliver them wherever they had to go. Albert left in his vehicle at the same time. I was never given any explanation as to what they were and no choice in the matter. He threatened me, if I didn't move fast enough or do as he said, he would physically attack me, break up household items, threaten to throw me out of the house.

Defendant's Exhibit 1 at 1-2.

Taken in the light most favorable to Defendant, this Court finds that, Mrs. Bond's allegations do not support a defense of the first type of duress. Plaintiff has provided this Court with nothing from which a finder of fact [*10] could reasonably conclude that she was physically compelled by her husband to sign the contract with Wausau. While she may have been subjected to continual threats and mental abuse, this is legally insufficient to establish a duress defense of the first type. Therefore, the contract is not void.

The Court further finds that Mrs. Bond's evidence is sufficient for a finding of the second type of duress, duress induced by threat. However, Wausau is not the party who induced Mrs. Bond's assent. Furthermore, Wausau, which bargained in good faith, had no knowledge of Mrs. Bond's duress and materially relied upon her assent in issuing the performance bond. Thus, this transaction falls squarely into the exception to the second type of duress as articulated in Restatement

1991 U.S. Dist. LEXIS 951, *

(Second) of Contracts § 175(2). See note 5, supra. Therefore, Mrs. Bond's duress defense fails. The contract between Mrs. Bond and Wausau is not voidable. Mrs. Bond is legally bound by the agreement. n8

n8 Wausau further claims that even if the contract were voidable, it was long ago ratified by Mrs. Bond's silence. *Blum, 59 Md.App. at 594; Saggese, 15 Md.App. at 388.*

Although the issue is not formally reached by this opinion, the Court notes that this is a factual question better suited to determination by a jury.

[*11]

*III.*

Plaintiff seeks both partial summary judgment for the amount of money it has already paid out under the bonds and specific performance of the contract in the form of a deposit of money to cover the reserve that it has been forced to set up to cover future losses under the bonds. It is entitled to both of these remedies.

It is well settled that a surety may sue for specific performance for deposit of security to cover the surety's reserve if such a provision is found in the indemnity agreement. The surety returns any unused portion of the reserve to depositor at the expiration of the indemnity agreement. See *American Motorists Insurance Co. v. United Furnace Co., 876 F.2d 293, 299-300 (2d Cir. 1989); Safeco Insurance Co. v. Schwab, 739 F.2d 431, 433 (9th Cir. 1984); Milwaukie Construction Co. v. Glens Falls Insurance Co., 367 F.2d 964, 965-66 (9th Cir. 1966); Safeco Insurance Co. v. Criterion Investment Corp., 732 F. Supp. 834, 843 (E.D. Tenn. 1989); United Bonding Insurance Co. v. Stein, 273 F. Supp. 929, 930 (E.D. Pa. 1967).* Likewise, this Court finds that partial summary judgment for liquidated damages may be granted.

Accordingly, Plaintiff's Motion [*12] for Partial

Summary Judgment is granted. Mrs. Bond will be ordered to pay $ 193,106.50 to the Plaintiff to be held as reserve against money it pays out from the Mech-Con bonds. Wausau will be allowed to reimburse itself immediately from this reserve of the $ 171,316.50 it has already paid out from the bonds. Any remaining funds will be held in reserve by Wausau pending further action in this case.

It will be so ordered.

*ORDER*

For the reasons set forth in the accompanying Memorandum Opinion, IT IS this 25th day of January, 1991, by the United States District Court for the District of Maryland, hereby ORDERED:

1. That Plaintiff Employers Insurance of Wausau Motion for Partial Summary Judgment BE, and the same hereby IS, *GRANTED;*

2. That Defendant Lorna D. Bond perform her obligations under the contract with Plaintiff Employers Insurance of Wausau, specifically, that she deposit $ 193,106.50 with Plaintiff Employers Insurance of Wausau as collateral security;

3. That judgment be entered in favor of Plaintiff Employers Insurance of Wausau against Defendant Lorna D. Bond in the amount of $ 171,316.50;

4. That Plaintiff Employers Insurance of Wausau BE, and hereby IS, authorized [*13] to reimburse itself out of the collateral security, up to the amount of judgment entered in paragraph 3 of this order;

5. That Plaintiff Employers Insurance of Wausau BE, and hereby IS, ordered to hold any remaining collateral security received from Defendant Lorna D. Bond, pending further action in this case;

6. That the Clerk of the Court mail copies of this Order and the accompanying Memorandum Opinion to all parties of record.

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Case No. 02-23106-CIV-MOORE

|  |  |
|---|---|
| INTERNATIONAL FIDELITY<br>INSURANCE COMPANY<br><br>    Plaintiff,<br><br>v.<br><br>CRISAL CONSTRUCTION CO.,<br>INC., a Florida corporation,<br>OVIDIO P. RODRIGUEZ,<br>ALICIA MARTI RODRIGUEZ,<br>WILLIAM D. REAL, and<br>CRISTINA M. REAL<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER GRANTING TEMPORARY RESTRAINING ORDER

UPON CONSIDERATION of Plaintiff International Fidelity Insurance Company's

("IFIC") Motion for a Temporary Restraining Order against Defendants Crisal Construction Co.,

Inc., Ovidio P. Rodriguez, and Alicia Marti Rodriguez, any opposition filed herein, and

argument, if any, the Court enters the following findings of fact:

    1.    That as an inducement for and in consideration of Plaintiff IFIC's issuance of

construction surety bonds on behalf of Defendant Crisal Construction Co., Inc. ("Crisal"), on or

about November 3, 2000, Defendants Crisal, Ovidio P. Rodriguez, Alicia Marti Rodriguez,

William J. Real and Cristina Real executed an Agreement of Indemnity in favor of IFIC;

    2.    That on or about June 26th 2001, Plaintiff IFIC, as surety, issued certain payment

and performance bonds on behalf of Defendant Crisal Construction Co., Inc., ("Crisal")  as

principal, for the School Board of Miami-Dade County, Florida's Project No. A0654, commonly known as the Phillis Wheatley Elementary School, Additions and Renovations (the "Project") ;

3.     That said bonds guaranteed the performance of Crisal's contractual obligations to the School Board of Miami-Dade County, Florida as well as its payment to those providing labor and/or materials for the Project;

4.     That as a result of its issuance of said bonds on behalf of Defendant Crisal, Plaintiff IFIC has incurred and will continue to incur damages in the form of losses, costs, and expenses as a result of Defendant Crisal's failure to satisfy its contractual obligations pertaining to the Project and Defendants Crisal, Ovidio P. Rodriguez, and Alicia Marti Rodriguez's failure to satisfy their obligations under the Agreement of Indemnity;

5.     That Plaintiff IFIC will be harmed in this matter as damages may be unobtainable from Defendants Crisal, Ovidio P. Rodriguez, and Alicia Marti Rodriguez's if the Court does not grant the requested injunctive relief to maintain the status quo;

6.     That Plaintiff IFIC will be harmed in this matter as a result of the likelihood of loss of goodwill to its business if the Court does not grant the requested injunctive relief to maintain the status quo;

7.     That should the Court not intervene to enjoin the dissipation of the assets of the Defendants Crisal, Ovidio P. Rodriguez, and Alicia Marti Rodriguez, the harm to Plaintiff IFIC will be irreparable as there will be no assets from which to recover the damages incurred by Plaintiff IFIC as result of its issuance of bonds on behalf of Crisal and its enforcement of the Agreement of Indemnity against said Defendants;

8.     That based upon the evidence submitted by Plaintiff IFIC, and the record herein, it

2

appears to the Court that Defendants Crisal, Ovidio P. Rodriguez, and Alicia Marti Rodriguez are presently dissipating assets.

WHEREFORE, it is this ___ day of November, 2002 at ____ A.M/P.M, by the United States District Court for the Southern District of Florida, hereby

ORDERED, that the Plaintiff IFIC's Motion for a Temporary Restraining Order against Defendants Crisal, Ovidio P. Rodriguez, and Alicia Marti Rodriguez be and hereby is GRANTED; and it is further,

ORDERED, that Defendants Crisal, Ovidio P. Rodriguez, and Alicia Marti Rodriguez, their officers, agents, servants, employees, and attorneys, be restrained and enjoined from selling, transferring, dissipating, encumbering, or otherwise disposing of their assets and property, whether held jointly or in common with others, until the disposition of this action; and it is

ORDERED, that Plaintiff IFIC is granted a lien upon all assets and property, including realty, personalty, and mixed property, in which Defendants Crisal, Ovidio P. Rodriguez, and Alicia Marti Rodriguez have an interest, until the disposition of this action; and it is

ORDERED, that Plaintiff IFIC is granted expedited discovery in the for of depositions of Defendants Crisal, Ovidio P. Rodriguez, and Alicia Marti Rodriguez; and it is further

ORDERED, that this Order shall expire 10 days after the date of its entry unless, for good cause shown, it is extended for a like period or unless Defendants Crisal, Ovidio P. Rodriguez, and Alicia Marti Rodriguez consent that it may be extended for a longer period.

_____
K. MICHAEL MOORE
United States District Court Judge

3

copies to:    Neil L. Henrichsen, Esq.
               Crisal Construction Co., Inc.
               Ovidio P. Rodriguez
               Alicia Marti Rodriguez
               William J. Real
               Cristina Real